**ATC PETROLEUM, INC., et al., Plaintiffs,**

**v.**

**John C. SANDERS, Administrator, Small Business Administration, Defendant.**

**KOCH FUELS, INC., Plaintiff,**

**v.**

**John C. SANDERS, Administrator, Small Business Administration, Defendant.**

Civ. A. Nos. 85–0828, 85–3701.

United States District Court, District of Columbia.

March 17, 1987.

John H. Zentay, Robert W. Hawkins, Edward J. Tolchin, Washington, D.C., Larry P. Ellsworth, Washington, D.C., Van R. Delhotal, Elton A. Ellison, Wichita, Kan., for plaintiffs.

Wayne P. Williams, Asst. U.S. Atty., Washington, D.C., for defendant; Claire M. Schenk, Washington, D.C., of counsel.

## OPINION

JUNE L. GREEN, District Judge.

These are two actions brought by suppliers of petroleum products who sold petroleum to one Tri-Par Combustion Corporation ("Tri-Par"), a certified participant in the disadvantaged business development program, under the Small Business Act of 1958. 15 U.S.C. §§ 632, 637(a) (1982). Plaintiffs seek to have the Small Business Administration ("SBA") reimburse them for the petroleum that they sold to Tri-Par for which they claim they have not been paid. Tri-Par is not a party to this proceeding. These cases, consolidated by order dated March 25, 1986, are now before the Court on motions for summary judgment. For the reasons set forth below, the Court grants defendant's motion for summary judgment in both cases.

### I. *Background*

A basic purpose of the Small Business Act of 1958 ("the Act") is to insure that a fair proportion of the total purchases and the total contracts and subcontracts for property and services of the United States Government be placed with small business enterprises in order to maintain and strengthen the Nation's economy. 15 U.S.C. § 631 (1982); *see Baillie Trash Hauling, Inc. v. Kleppe,* 477 F.2d 696, 703 (5th Cir.1973), *cert. denied,* 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 468 (1974). Consonant with this general purpose, section 8(a) of the Act authorizes the Administra-

tor of the SBA to enter into contracts with other federal departments and agencies to furnish them with articles, supplies, equipment, and for construction. 15 U.S.C. § 637(a)(1) (1982). In turn, the SBA is empowered to arrange for the performance of such procurement contracts by negotiating subcontracts with eligible section 8(a) firms. Eligible section 8(a) firms are defined as small businesses owned by "socially and economically disadvantaged individuals," *i.e.,* persons who have been subjected to prejudice because of their identity as members of a group whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities. 15 U.S.C. § 637(a)(5) and (6) (1982).

The SBA provides contract, technical, and management support to section 8(a) companies by advising them concerning the operation of their business and the fulfillment of government contract specifications. 15 U.S.C. § 637(b)(1)(A) (1982). The SBA may also make available to section 8(a) firms certain forms of financial support. Until recently, the SBA offered financial assistance under the "advance payment" program. Under that program, the SBA provided interest-free loans to section 8(a) businesses to assist them "in meeting financial requirements" for the performance of section 8(a) government supply contracts. 13 C.F.R. § 124.1–2(a) (1986).

In order to protect these funds, Congress mandated that such loans be made only after finding "that to [make the loan] would be in the public interest," and if the loan was backed by "adequate security." 41 U.S.C. § 255(c) (1982). The "security" for advance payments is required to be in the form of a "lien in favor of the Government on the property contracted for, on the balance of an account in which such payments are deposited, and such of the property acquired for performance of the contract as the parties may agree." *Id.* The SBA promulgated regulations to provide safeguards for its advance payment regulations as required by 41 U.S.C. § 255 (1982). *See* 13 C.F.R. § 124.1–2 (1986).

## II. *Findings of Fact*

Tri-Par was a certified section 8(a) firm whose principal business was the supply of fuel oil to retail customers. Plaintiffs ATC Petroleum, Inc. ("ATC"), Tidewater Fuels, Inc. ("Tidewater"), and Koch Fuels, Inc. ("Koch") were fuel oil suppliers to Tri-Par. The SBA, through its New York City office, entered into various fuel oil supply contracts since before 1976 with United States Government agencies and departments using Tri-Par as the subcontractor. Koch's Exhibits D, E, F. In order to achieve contract fulfillment, the SBA provided Tri-Par with some management advice and advance payments in accordance with the applicable regulations, 13 C.F.R. § 124.1–2 (1986), continuously from 1975 through 1980. Koch's Exhibit G; ATC/Tidewater's Exhibits 21, 32.

Tri-Par's dealings with Koch date to 1976. In that year, Tri-Par first approached Koch, as a section 8(a) subcontractor to the SBA, to purchase fuel oil for resale to the Department of Defense. Koch reviewed Tri-Par's proposal but declined to do business with Tri-Par as it did not meet Koch's credit requirements.

Thereafter, the SBA contacted Koch on Tri-Par's behalf. The SBA wrote to Koch that it was advancing funds to Tri-Par, and that these funds would be maintained in a special bank account under SBA control. Koch's Exhibit A. These funds would facilitate Tri-Par's furnishing fuel to various government installations for fiscal year 1977.

This assurance in hand, Koch sold fuel oil to Tri-Par in 1976, 1977, and 1978. The succeeding section 8(a) contracts that Tri-Par received were each for a term of one year. When Koch appeared reluctant to sell larger quantities of fuel oil to Tri-Par in 1978 and 1979, the SBA extended written and oral assurances to Koch that the SBA advance payment funds remained available under the same terms and conditions as set forth in the SBA's 1976 letter to Koch. Koch's Exhibits A, B, C. Koch, however, had no contractual relationship with the SBA. Koch continued making fuel oil sales to Tri-Par until September 1981, as Tri-Par endeavored to perform successive section 8(a) subcontracts from the SBA.

On September 29, 1980, the SBA entered into an indefinite quantity requirement type contract with the Defense Fuel Supply Center ("DFSC") for delivery of fuel oil to various military installations. On the same day, the SBA awarded another section 8(a) subcontract to Tri-Par, so that Tri-Par could supply the DFSC under the SBA's contract. ("September 1980 contract"). This contract obligated Tri-Par to supply approximately $10.8 million worth of fuel oil for fiscal year 1981. Tri-Par, in turn, contracted with Koch to supply it with the necessary fuel oil in order that Tri-Par could satisfy the September 1980 contract.

Tri-Par's financial situation weakened soon after it entered into the September 1980 contract. Unable to secure financing from a private lender, Tri-Par requested the SBA to provide it with advance payment assistance. ATC/Tidewater's Exhibits 12, 13. The SBA agreed on January 20, 1981, to provide $4.2 million in advance payments. This agreement was memorialized as Modification No. 1 to the September 1980 contract. Concurrently, the SBA and Tri-Par established a special bank account to receive all payments due under the September 1980 contract, as security for the advance payment loan. In accordance with the SBA's regulations, all disbursements from the account required the SBA's countersignature. 13 C.F.R. § 124.1–2(c)(1)(ii)(A) and (B) (1986). In addition, every withdrawal from the special account to pay Tri-Par suppliers required the submission of the supplier's original invoice and a copy of Tri-Par's billing to the receiving entity. 13 C.F.R. § 124.1–2(d)(1) (1986). The SBA also retained a "paramount lien" on the credit balance in the account and on any supplies contracted for under the September 1980 contract.

The SBA sent the DFSC a copy of contract Modification No. 1, notifying it of the restrictive conditions to which Tri-Par was subject in connection with the $4.2 million advance payment. Tri-Par received all of the authorized advance payment funds by late May 1981.

In July 1981, an SBA examination of the special account bank statements revealed that proceeds from the contract were not being deposited properly into the special account. ATC/Tidewater's Exhibit 3 at 2. On September 23, 1981, having confirmed that the special bank account was $1.3 million short, the SBA demanded that all DFSC purchasing authorities withhold payments still owing under the September 1980 contract. ATC/Tidewater's Exhibit 29. The SBA later demanded that these payments be directed to the SBA. ATC/Tidewater's Exhibit 31.

In this manner, the SBA recouped approximately $660,000, reducing its exposure on the advance payment loan from $1.3 million to $657,694. As a result of these recovery efforts, Koch was not paid for its August and September 1981 deliveries to Tri-Par, totaling $495,543.22. The SBA recovered the remainder of the advance payment loan through stop payment orders issued on a separate section 8(a) contract held by Tri-Par.

This is where ATC and Tidewater come into the story. In the early part of 1981, the SBA commenced negotiations with Tri-Par concerning the potential award of another section 8(a) subcontract. Under this subcontract, Tri-Par would supply fuel oil to the DFSC in the southeastern part of the United States ("the Southeast contract"). Tri-Par began simultaneously negotiations with Tidewater to supply these petroleum products on credit. Tidewater then engaged ATC in negotiations to join in supplying fuel oil to Tri-Par. ATC/Tidewater's Exhibit C at ¶ 7. ATC and Tidewater subsequently agreed to supply the product to Tri-Par on credit. Id. at ¶ 8.

Tri-Par advised the SBA that it had secured a source of supply for the Southeast contract. ATC/Tidewater's Exhibits 10, 11, 23. Thereafter, the SBA awarded the subcontract to Tri-Par on June 4, 1981. Id. at 21. Under the terms of the subcontract, Tri-Par was to deliver approximately $12.2 million in fuel oil to DFSC installations between June 1981, and March 1982. Id.

In the autumn of 1981, ATC and Tidewater noticed that Tri-Par was falling behind in its payments to them. The companies contacted Tri-Par concerning this problem, and they were informed that the reason for the tardy payments was that the DFSC was delinquent in paying Tri-Par under the Southeast contract. Tri-Par assured ATC and Tidewter that steps were being taken to remedy the payment problems. ATC/Tidewater's Exhibit A at ¶ 5.

The late payment problem persisted into December 1981. ATC and Tidewater again approached Tri-Par and proposed that all payments from the DFSC under the Southeast contract be paid into a bank account controlled jointly by ATC, Tidewater, and Tri-Par. Tri-Par agreed, and ATC and Tidewater officials met with DFSC officials on December 21, 1981, to obtain their approval of the proposed joint account. ATC/Tidewater's Exhibit A at ¶ 7.

The representative DFSC official responded that the DFSC could not agree to the proposed payment procedure because the SBA had issued a stop payment order on the Southeast contract. The SBA informed the DFSC on December 9, 1981, that it was "setting off" $657,940 owed by the DFSC to Tri-Par under the Southeast contract and demanded that the DFSC pay that amount to the SBA. ATC/Tidewater's Exhibit 4; Affidavit of Jesse R. Quigley, SBA official, at ¶¶ 5–9.

A representative of ATC contacted Mr. Jesse R. Quigley, the proper SBA official, on December 31, 1981, to inquire about the setoff of payments due Tri-Par under the Southeast contract. Mr. Quigley confirmed the SBA's actions against Tri-Par, but he indicated that the SBA was still considering alternatives to the setoff being proposed by Tri-Par. ATC/Tidewater's Exhibits A at ¶ 10; 5 at 2; Affidavit of Jesse R. Quigley at ¶ 8.

Subsequently, the SBA rejected Tri-Par's alternative proposal to the setoff. In January 1982, the SBA demanded that the DFSC honor the setoff. ATC/Tidewater's Exhibit 25. On January 11, 1982, the DFSC acceded to this demand and remitted

to the SBA $636,597 that was due and owing under the Southeast contract.[1]

By these collection efforts, the SBA was made whole for the $4.2 million advance payment loan made to Tri-Par to enable performance of the September 1980 contract. While the SBA's intervention satisfied Tri-Par's indebtedness to it, Tri-Par remained indebted to Koch, ATC, and Tidewater for deliveries made in connection with the September 1980 contract and the Southeast contract.

ATC, Tidewater, and Koch seek to recover from the SBA monies owed them by Tri-Par. As no contract existed between plaintiffs and the SBA, plaintiffs base their actions on various equitable theories. ATC, Tidewater, and Koch seek to establish an equitable lien against the advance payment funds allocated to Tri-Par to pay for fuel oil deliveries. ATC/Tidewater Complaint ¶¶ 27–29; Koch Complaint ¶¶ 23–25. All the plaintiffs also seek restitution from the SBA for their losses suffered owing to the SBA's alleged breaches of contractual, regulatory, and statutory duties. ATC/Tidewater Complaint ¶¶ 30–38; Koch Complaint ¶¶ 26–30. Additionally, Koch alleges that its reliance on representations made by the SBA creates a contract by estoppel between Koch and the SBA. Koch Complaint ¶¶ 21–22. Last, Koch asserts that the SBA breached a contract to which Koch was a third-party beneficiary. Koch Complaint ¶¶ 31–32.

### III. *Conclusions of Law*

#### A. *Appropriateness of Summary Judgment*

Plaintiffs argue that summary judgment in defendant's favor is inappropriate because, *inter alia,* the facts remain in considerable dispute. Koch asserts, for instance, that certain SBA officials made assurances concerning control of the advance payment funds which induced Koch to do business with Tri-Par. *E.g.,* Koch's Exhibit 1 at ¶ 3. The SBA denies that its officials made any representations that the advance payment funds were advanced for Koch's benefit. *E.g.,* Defendant's Exhibit 1 at ¶ 4.

Likewise, the SBA counters ATC's and Tidewater's factual allegations that they were misled deliberately into doing business with Tri-Par to enable the SBA to recoup fully its advance payment made in connection with the September 1980 contract. *E.g.,* ATC/Tidewater's Exhibit A at ¶ 8; Defendant's Exhibit 1 at ¶ 4.

While summary judgment should be employed to avoid useless trials where there are no genuine issues of material fact in dispute, "summary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use." *Brunswick Corp. v. Vineburg,* 370 F.2d 605, 612 (5th Cir.1967); Fed.R. Civ.P. 56. In ruling on a motion for summary judgment, the Court must confine its inquiry to determining whether a genuine, triable issue of fact exists, and must not attempt to resolve prematurely bona-fide factual disputes under the guise of a Rule 56 disposition. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Defendant has demonstrated sufficiently that no material issue of fact blocks the way to a judgment in its favor on the law. *See Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2550–53, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970).

There is no dispute as to the chronology of events. The only conflict lies in the characterization of certain actions on the SBA's part in view of the legal theories proffered by plaintiffs. As discussed below, the applicable legal principles render inapposite the parties' conflicting factual contentions. *See Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

#### B. *The SBA Is Protected In Its Sovereign Capacity*

■ In surveying the legal topography, it is clear that the SBA enjoys the safety of the high ground. As an integral part of the federal government's endeavoring to fulfill its statutory mandate, the SBA is

---

**1.** The amount ultimately offset on the Southeast contract was reduced from $657,940 to $636,597 due to further collections that the SBA made on the September 1980 contract.

immune from plaintiffs' equitable challenges. *See Portmann v. United States,* 674 F.2d 1155, 1160–61 (7th Cir.1982); *American Savings v. Bell,* 562 F.Supp. 4, 8 (D.D.C.1981).

While "[t]he fundamental principle of equitable estoppel applies to government agencies, as well as private parties," *Investors Research Corp. v. SEC,* 628 F.2d 168, 174 n. 34 (D.C.Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980), there is a traditional reluctance to apply the doctrine against the government. *See, e.g., Heckler v. Community Health Services,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984); *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 383–84, 68 S.Ct. 1, 2–3, 92 L.Ed. 10 (1947). This is particularly true where the government entity is acting in its "sovereign capacity" as opposed to its "proprietary capacity."

■ Proprietary functions of the government have been defined to include contracts consisting of essentially commercial transactions involving the purchase or sale of goods or services. For such contracts, courts have tended to find no significant obstacles to estoppel-based actions stemming from the conduct of government officials, so long as the officials were acting within the scope of their authority. *Portmann v. United States,* 674 F.2d at 1161. Government transactions found to be within the ambit of sovereign responsibilities include various loan agreements, subsidies, and direct grants. The circuit court in *Portmann v. United States* found the distinction between the government's sovereign and proprietary functions important "as a shorthand reminder that 'protection of the public welfare and deference to Congressional desires ... much more apt to outweigh hardships to private [parties] in the equitable balance when estoppel is asserted against sovereign acts,' than when purely commercial federal interests are at stake." *Id.* at 1160–61 (quoting *Santiago v. Immigration & Naturalization Service,* 526 F.2d 488, 496 (9th Cir.1975) (Choy, J., dissenting), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976)).

In *American Savings v. Bell,* 562 F.Supp. at 8, the court found that where the government entered into contracts involving federally insured student loans, it acted in a sovereign capacity. The court emphasized that the government conferred a benefit to the public in promoting higher education. Numerous other courts have shielded the government from estoppel-based actions where the government was found to have acted in a sovereign capacity although otherwise engaged in a commercial venture. These ventures have included the construction of a sewer system, the provision of disability benefits, and a dispute over title to public lands. *See, e.g., Somerville Technical Services v. United States,* 640 F.2d 1276, 1282, 226 Ct.Cl. 291 (1981); *Gressley v. United States,* 609 F.2d 1265, 1267 (7th Cir.1979); *United States v. Florida,* 482 F.2d 205, 209 (5th Cir.1973).

Still, other courts, casting aside these categorical distinctions, have allowed the government to be estopped. For instance, the circuit court wrote in *United States v. Lazy FC Ranch,* 481 F.2d 985, 989 (9th Cir.1973), that "although we may be more reluctant to estop the government when it is acting in [its sovereign] capacity," nevertheless "estoppel is available as a defense against the government if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel." *See also* Note, *Equitable Estoppel of the Government,* 79 Colum.L.Rev. 551, 555 (1979) (and cases cited therein).

Nevertheless, with no clear guidance from our Circuit Court on this issue, the Court finds the sovereign capacity/proprietary capacity distinction helpful. *See Molton, Allen & Williams v. Harris,* 613 F.2d 1176, 1179 (D.C.Cir.1980). The purposes of the section 8(a) program are to foster business ownership and development, and to promote the competitive viability of firms owned by individuals who are both socially and economically disadvantaged, through the United States Government procurement process. 15 U.S.C. § 631 (1982); 13 C.F.R. § 124.1–1 (1986). It is uncontested that the SBA extended the $4.2 million advance pay-

ment loan as a means to facilitate Tri-Par's performance of the September 1980 contract, consistent with the ends of the section 8(a) program. The fact that these advance payment loans are interest free indicates further the overriding governmental desire to further national policy, as opposed to procuring the fruits of the project for itself in a proprietary sense.

In addition, no reliable evidence has been submitted that might indicate any affirmative misconduct on the SBA's part in extending the advance payment loan or in liquidating it. *See Oki v. Immigration and Naturalization Service*, 598 F.2d 1160, 1162 (9th Cir.1979) (Only "affirmative misconduct" by government officials will trigger an estoppel.); *see also* ATC/Tidewater's Exhibit A at ¶ 8 (hearsay). The SBA acted pursuant to proper statutory authority to recover the advance loan payment as a priority creditor. 41 U.S.C. § 255(c) (1982); 4 C.F.R. § 102.3 (1986); 13 C.F.R. § 124.1–2 (1986).

Nor does plaintiffs' reliance on any unauthorized statements by SBA officials which may have led plaintiffs to contract with Tri-Par create an estoppel against the SBA. *See, e.g.,* ATC/Tidewater's Exhibit C at ¶¶ 5, 7; Koch's Exhibits A, B, C. As a general rule, the government is not bound by the statements or assurances of its officers where the actual authority to make such statements or assurances is lacking. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. at 384, 68 S.Ct. at 3; *National Treasury Employees Union v. Reagan*, 663 F.2d 239, 249 (D.C.Cir.1981); *see also Loftin v. United States*, 6 Cl.Ct. 596, 609 (1984) ("[T]hose who deal with government agents are charged with knowledge of the regulations which govern their dealings."). In other words, those dealing with the government cannot rely upon any theory of apparent authority.

No authority exists whereby an SBA official could obligate advance payment funds to the supplier of a section 8(a) contractor or to guarantee payment to the supplier in the event of default by the section 8(a) contractor. SBA regulations provide that the SBA is to secure a first lien on all payments into the advance account and that no withdrawal of subcontract proceeds may be made from the special bank account until the full amount of the advance payment is liquidated. *See* 13 C.F.R. § 124.1–2 (1986). Any payment, or guarantee of payment, to plaintiffs by the SBA would have been in contravention of SBA regulations, as well as the federal statute that authorizes the government to extend such advance payment loans. *See* 41 U.S.C. § 255(c).

That the SBA employees were without authority to commit funds to Tri-Par's suppliers also undermines Koch's attempt to establish an implied-in-fact contract between itself and the SBA. No "meeting of the minds" could have occurred, as the SBA officials had no actual authority to enter into a contractual agreement to pay Tri-Par's suppliers directly. *See ATL, Inc. v. United States*, 735 F.2d 1343, 1345 (Fed. Cir.1984); *see also Peter v. United States*, 6 Cl.Ct. 768, 777 (1984) ("The requirements of mutuality of intent and lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract....").

Moreover, by concluding that no authority exists whereby the SBA could guarantee payment to plaintiffs for goods delivered to Tri-Par, a traditional case of estoppel is precluded. To establish an estoppel claim against the government, plaintiffs would have to prove false representation, a purpose to invite action by the party to whom the representation was made, ignorance of the true facts by that party, and reasonable reliance. *See Int'l Org. of Masters, Mates & Pilots v. Brown*, 698 F.2d 536, 551 (D.C. Cir.1983); *see also Heckler v. Community Health Services*, 467 U.S. at 59, 104 S.Ct. at 2223 ("... reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading.") (citation and footnote omitted). In failing to ascertain the legal parameters of the SBA's authority, plaintiffs failed to act reasonably. Thus, plaintiffs may not claim reasonable reliance on the SBA's representations that the SBA may have made to the effect that it would guar-

antee payment to plaintiffs for deliveries to Tri-Par. *See Heckler v. Community Health Services*, 467 U.S. at 63, 104 S.Ct. at 2225; *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. at 384, 68 S.Ct. at 3.

While the apparent loss that plaintiffs have suffered in their dealings with Tri-Par are not insignificant, neither are they so great as to overwhelm the "strong considerations of equity and of public policy [that] militate against creation of an expectation interest by estoppel." *National Juvenile Law Center v. Regnery*, 738 F.2d 455, 464 (D.C.Cir.1984); *see also Heckler v. Community Health Services*, 467 U.S. at 60, 104 S.Ct. at 2224 ("When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined."); *Goldberg v. Weinberger*, 546 F.2d 477, 481 (2d Cir.1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977) ("The government could hardly function if it were bound by its employees' unauthorized representations."). Moreover, plaintiffs here appear to be fairly sophisticated entities, still with a right of action against Tri-Par. *Compare Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (Government not estopped under much more sympathetic circumstances.).

■ Plaintiffs rely heavily on *Trans-Bay Engineers & Builders, Inc. v. Hills*, 551 F.2d 370 (D.C.Cir.1976) (*"Trans-Bay"*), in an attempt to establish an equitable lien against the advance payment loan made to Tri-Par. In addition to many of the reasons stated above, plaintiffs' reliance on *Trans-Bay* is inapposite.

In *Trans-Bay*, the Department of Housing and Urban Development ("HUD") had contracted with a nonprofit organization known as "MORH" for the construction and ownership of a low-income housing project. HUD agreed to insure and subsidize the project's mortgage under the National Housing Act, a statute designed to encourage construction of rental housing for the poor. HUD was not merely an insurer and subsidizer; however, "it was the guiding spirit" of the project, exercising vast control over the entire undertaking. *Trans-Bay*, 551 F.2d at 381. Subsequently, MORH defaulted on its mortgage, exposing HUD to substantial liability. To cover its liability, HUD foreclosed on the project, taking all the money remaining in an undisbursed mortgage fund. This money was earmarked previously to pay Trans-Bay, MORH's building contractor.

The circuit court wrote that MORH was HUD's "creature," existing solely because of a "government inspired social purpose." *Trans-Bay*, 551 F.2d at 382. In this situation the court found that HUD had unique equitable duties and was required to bear the losses. *Id.* at 381–82. Based upon these circumstances, the court ruled that HUD was not entitled to foreclose, but rather that Trans-Bay was "entitled to an equitable lien," *id.* at 383, in order "to forestall a cosmetic fraud based upon the niceties of the contractual arrangements constructed by HUD." *Id* at 382.

Here, in contrast, the SBA nowhere agreed to insure or subsidize Tri-Par's performance, and no such authority to do so exists. While Tri-Par received SBA technical assistance, subcontract preferences, and occasional short-term loans under the section 8(a) program, no reading of the evidence would cast Tri-Par as a "creature" of the SBA.

Plaintiffs' reliance on *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) (*"Kimbell Foods"*), is equally misplaced. Plaintiffs cite *Kimbell Foods* for the proposition that the SBA, as a quasi-commercial lender, "does not require ... the special priority which it compels as sovereign...." *Id.* at 737–38, 99 S.Ct. at 1463. That case, however, did not concern an advance payment loan to a section 8(a) contractor. The SBA had guaranteed 90 percent of a private loan pursuant to 15 U.S.C. § 636(a)(1). The *Kimbell Foods* Court decided, *inter alia*, that contractual liens arising from certain federal loan programs do not take precedence over private liens, absent a federal statute that sets priorities. Here, 41

U.S.C. § 255(c) (1982) provides explicitly that the government's lien on advance payments "shall be paramount to all other liens."

### C. *The SBA Is Not Liable For Any Breach of Regulatory or Statutory Duty*

Koch contends that the SBA failed to abide by its regulations governing advance payments in not supervising properly the special bank account. 13 C.F.R. § 124.1–2 (1986). Koch maintains that the SBA is liable for its breach of fiduciary duty to Koch. ATC and Tidewater approach on a different tack, claiming that the SBA is liable to them under an "implied-in-law" contract pursuant to which the SBA must disgorge the monies it recovered through its offset, because the SBA's retention of such monies is inequitable, owing to the SBA's failure to apply strictly 13 C.F.R. § 124.1–2 (1986).

Although there are numerous cases holding that an agency cannot violate its own regulations where their underlying purpose is to protect personal liberties or interests, this is not such a case. *See, e.g., United States v. Caceres,* 440 U.S. 741, 755, 99 S.Ct. 1465, 1473, 59 L.Ed.2d 733 (1979); *Vitarelli v. Seaton,* 359 U.S. 535, 545, 79 S.Ct. 968, 975, 3 L.Ed.2d 1012 (1959). An agency is not bound rigidly by its regulations where those regulations were not adopted to confer important procedural benefits upon individuals. *American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 538–39, 90 S.Ct. 1288, 1292–93, 25 L.Ed.2d 547 (1970). The advance payment statute and the regulations promulgated thereunder exist principally "to improve the ability of small business concerns to compete for Government awards without any increase in the cost to the Government." S.Rep. No. 2201, 85th Cong., 2d Sess. 3, *reprinted in* 1958 U.S. Code Cong. & Admin.News 4021, 4023; *see also* 41 U.S.C. § 255 (1982); 13 C.F.R. § 124.1–2 (1986). Conspicuously absent from the advance payment regulations and legislative history is any reference to the provision of payment guarantees to material men or suppliers. *Id.*

■ Accordingly, as a threshold matter, plaintiffs may not rely on the SBA's admittedly poor supervision of the special bank account to establish liability. Further, ATC's and Tidewater's attempt to establish an implied-in-law contract must fail. Such a claim requires a demonstration that (a) defendant was enriched, (b) at plaintiffs' expense, and (c) that defendant retained the benefit under inequitable circumstances. *Chase Manhattan Bank v. Banque Intra, S.A.,* 274 F. Supp. 496, 499 (S.D.N.Y. 1967). Not only is the SBA shielded from this equitable claim by its sovereign capacity, *supra* at 13–16, but the SBA was not enriched unjustly at plaintiffs' expense. *See United States v. Neidorf,* 522 F.2d 916, 919 n. 5 (9th Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976) (A claim for an implied-in-law remedy is, in essence, a claim for unjust enrichment.). Here, the SBA acted pursuant to proper authority to recover only the funds owed by Tri-Par to the SBA under the advance payment agreement. 41 U.S.C. § 255(c) (1982).

### D. *Koch Is Not a Third-Party Beneficiary*

■ A claimant who seeks recovery as an alleged third-party beneficiary of a government contract must prove that the government's promises were made for the direct, specific benefit of the claimant. *See, e.g., Ables v. United States,* 2 Cl.Ct. 494, 500 (1983), *aff'd,* 732 F.2d 166 (Fed.Cir. 1984). Koch has submitted no evidence to indicate, even remotely, that the SBA extended the advance payment loan to Tri-Par for Koch's direct, specific benefit. *See Celotex Corp. v. Catrett,* 106 S.Ct. at 2553 (A nonmoving party to a summary judgment motion is required to "designate specific facts showing that there is genuine issue for trial."); *see also H.F. Allen Orchards v. United States,* 4 Cl.Ct. 601, 607 (1984) (Benefitting from the performance of a contract, by itself, does not make one a third-party beneficiary of the contract.).

### IV. *Conclusion*

Plaintiffs' attempt to hold the SBA liable for the losses they suffered in their deal-

ings with Tri-Par is legally insufficient. Nevertheless, the facts indicate that the SBA's performance in this affair was less than satisfactory. *See* ATC/Tidewater's Exhibits 9, 18; Defendant's Exhibit 2. As one court has written, the SBA "... perhaps has an obligation to use due care to avoid causing harm to the interests of others, and at least as a matter of common courtesy and a desire to retain the confidence of the public in the integrity of the agency...." *Security Bank & Trust Co. v. United States*, 2 Cl.Ct. 646, 650 (1983), *aff'd*, 731 F.2d 861 (Fed.Cir.1984), *cert. denied*, 469 U.S. 1107, 105 S.Ct. 781, 83 L.Ed.2d 776 (1985).

The aims and goals of the section 8(a) program are laudatory. The SBA must nurture carefully the confidence of those private parties that deal with section 8(a) contractors, if the section 8(a) program is to succeed ultimately in expanding the private enterprise system and strengthening the overall economy of the Nation. *See* 15 U.S.C. § 631 (1982). Trust cannot be appropriated or loaned; it can only be earned. An order is attached.

## ORDER

Upon consideration of defendant John C. Sanders, Administrator, Small Business Administration's motion for summary judgment; plaintiff Koch Fuels, Inc.'s ("Koch") opposition thereto and cross-motion; plaintiffs ATC Petroleum, Inc. ("ATC") and Tidewater Fuel, Inc.'s ("Tidewater") opposition to defendant's motion for summary judgment; defendant's replies and opposition to plaintiff Koch's cross-motion; plaintiff Koch's reply; plaintiff ATC's and Tidewater's additional reply; exhibits and affidavits; the entire record herein; and for the reasons set forth in the accompanying opinion, it is by the Court this 17th day of March 1987,

ORDERED that Koch's cross-motion for summary judgment is denied; it is further

ORDERED that defendant's motion for summary judgment is granted as to both cases; and it is further

ORDERED that these cases are dismissed.