**INFORMATION SYSTEMS & NETWORKS CORPORATION, et al., Plaintiffs,**

**v.**

**James ABDNOR, Administrator of the U.S. Small Business Administration, et al., Defendants.**

**Civ. A. No. 88–0310.**

United States District Court, District of Columbia.

April 21, 1988.

Daniel J. Piliero, Pamela J. Mazza, Michael A. Hiser, Washington, D.C., for plaintiffs.

Patricia Frohman, Eric Benderson, Mark Stephens, Christine Muth, Washington, D.C., for defendants.

JOHN H. PRATT, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs filed this action seeking injunctive and declaratory relief and damages on February 8, 1988. A hearing was held on February 26, 1988. At plaintiffs' request, we consolidated hearing on their application for preliminary injunction with trial on the merits.[1] Upon careful consideration of the briefs filed by the parties and the record as a whole, we find that plaintiffs have failed to make their case.

### I.

### FINDINGS OF FACT

A. *Decision Making Process*

1. Systems Management American Inc. (SMA) was a Section 8(a) ("8(a)") certified minority owned firm under the Small Business Administration's ("SBA's") 8(a) program, 15 U.S.C. § 637(a) (1982), until October 21, 1987.

2. SMA was the incumbent contractor and had satisfactorily performed the Navy's Shipboard Non-tactical ADP Program II (SNAP–II) 8(a) contract since 1982. SMA was at one time the Navy's recommended source for fulfillment of its SNAP–II requirements. However, the Navy did not execute contract modifications with SMA regarding options for the fiscal year 1988 to 1991 SNAP–II requirements before that company graduated from the 8(a) program.

---

1. This was done pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure and Rule 205(d) of the Rules of the United States District Court for the District of Columbia.

3. SMA, the Navy and SBA had anticipated entering into a final agreement regarding the modifications prior to October 21, 1987, the date on which SMA was scheduled to graduate from the 8(a) program. On October 21, 1987, SMA did in fact graduate from the 8(a) program and became ineligible to perform the SNAP–II requirements as set aside by the Navy.

4. On November 9, 1987, the Navy advised SBA that SMA had graduated from the SBA program, and recommended two other companies to supply the remaining quantities of systems and installations to complete the SNAP–II program.

5. The plaintiffs, Information Systems and Networks Corporation (ISN) and Technology Applications, Inc. (TAI), were the two 8(a) certified minority firms recommended by the Navy to meet the SNAP–II requirements for fiscal year 1988–1991.

6. ISN is and has been an 8(a) company since August 15, 1980. It is scheduled to graduate from the 8(a) program on April 21, 1989. ISN has received over $53 million in 8(a) contract support covering 96 contracts. At the inception of this lawsuit, ISN had an additional fourteen months of eligibility in the 8(a) program during which it could receive additional 8(a) contracts. ISN had a net worth of $7.8 million dollars at the conclusion of fiscal year ("FY") 1986. ISN continued to receive all of the benefits of the 8(a) program during SBA's review of the SNAP–II requirement.

7. TAI is and has been an 8(a) company since October 31, 1978. It is scheduled to graduate from the 8(a) program on April 21, 1988. TAI has received over $118 million in 8(a) contract support. TAI had a net worth of $4 million at the conclusion of FY 1987. TAI continued to receive all of the benefits of the 8(a) program during the SBA's review of the SNAP–II requirements.

8. SMA has been an 8(a) company since August 27, 1971. During these sixteen years, SMA has received $187 million in 8(a) contract support but, at the conclusion of FY 1986, it had a net worth of only $149,802. By comparison, as noted, ISN and TAI had net worths of $7.8 million and $4.0 million, respectively.

9. As noted, the Navy did not execute contract modifications with SMA to add priced options for its fiscal year 1988 to 1991 SNAP–II requirements prior to that firm's October 21, 1987 graduation. In a letter to the SBA dated November 30, 1987 the Navy indicated that it could not execute these modifications for SNAP–II after October 21, 1987, because SMA had graduated from the 8(a) program. Further, the Navy concluded that no enforceable agreement had been reached by the Navy, SBA, and SMA for the fiscal year 1988–1991 SNAP–II requirements before SMA's graduation date of October 21, 1987.[2] While limited portions of a tripartite agreement have been introduced, they reflect at most an expectation among the parties that they would agree on priced options for the fiscal year 1988–1991 requirements in subsequent contract modifications. Further, plaintiffs have not demonstrated that these documents were entered into for the benefit of anyone other than SMA.

10. The Small Business Administration did not respond to the Navy's offer letter regarding TAI and ISN within ten (10) working days of November 9, 1987, because it was evaluating whether SMA had a valid contract with the Navy. It also wished to give the plaintiffs an opportunity to make detailed submissions and to be heard in support of their position.

11. Neither the Navy nor the SBA officials encouraged TAI or ISN to incur startup costs in anticipation of the award of the contract, nor were these officials authorized to do so.

12. Mr. James Chapman, President of TAI, contacted and met with Alfredo Gonzalez, Associate Administrator for Minority Small Business and Capital Ownership Development of the Small Business Adminis-

2. Plaintiffs have produced portions of the September 30, 1987 tripartite agreements, but have otherwise failed to produce evidence supporting their contention that these tripartite agreements, and earlier related letter contracts, represented a binding agreement between Navy and SBA for the SNAP–II fiscal year 1988–1991 requirements.

tration, on December 2, 1987, to present his views on the contract. Mr. Chapman stated that he was not there to undermine the efforts of another 8(a) company but that TAI would like the SNAP–II contract if SMA could not receive an award under the 8(a) program. On December 5, 1987, SMA applied to SBA requesting that the SNAP–II contract be released from the 8(a) program to the Navy in accordance with SBA Standard Operating Procedure 80 05 ¶ 46(e) revision 1 (hereinafter SOP ¶ 46). SMA stressed the importance of the SNAP–II contract to its financial health, and the devastating consequences that would likely result were it denied the opportunity to compete.

13. SOP ¶ 46(e) sets forth guidelines to assist SBA officials in the exercise of their discretion in deciding whether to retain or release a contract from the 8(a) program. The decision must be reviewed by three levels of SBA officials for a national buy.[3] In this case, a review was conducted by officials in the Richmond District, the Philadelphia Region (Region III) and the Central Office in Washington, D.C. The adoption of SOP ¶ 46(e) on April 27, 1987, was intended to provide policy guidance to program officials in the event that they wished to consider returning a contract to an agency for restricted competitive bidding. SMA's application to return the SNAP–II contract to competitive bidding under SOP ¶ 46(e) was the first one of its kind received by the Central Office. The situation in question represented the first time that the Central Office acted to review the release of a national buy contract under SOP ¶ 46(e), which had been adopted only six months earlier. The SMA has introduced evidence of "local buys" that were released prior to the adoption of SOP ¶ 46(e). The adoption of SOP ¶ 46(e) was intended to provide general policy guidance for all offices of the SBA in balancing the competing needs of 8(a) companies. Under SOP ¶ 46(e) the release of a contract from the 8(a) program depends on the size of the

company; current contracts with options for the graduating firm; the importance of the contract for the present 8(a) company's stability; and the need of other 8(a) companies for the contract to complete their business plan objectives. However, contracts are not automatically released when 8(a) firms graduate. Paragraph 46(e) merely provides the relevant program officials with discretionary guidelines to consider in taking such action.

14. On December 9, 1987, the Richmond District Office recommended release of the contract covering SNAP–II requirements so that SMA could bid competitively for the contract. The District Office reviewed each of the four factors listed above. The District Office concluded, *inter alia,* that denying SMA an opportunity to bid on the contract, by leaving it in the 8(a) program, would adversely impact upon SMA, because the SNAP–II contract represented 60% of its anticipated revenues. In addition, SMA had made substantial financial commitments in anticipation of the award, and anticipated a loss of approximately 400 of its 600 workers if the contract was lost. Lastly, the District concluded that none of its 8(a) firms needed the contract to complete their business plan objectives.

15. On December 16, 1987, the Philadelphia Regional Administrator joined in the District Office's recommendation to release the SNAP–II contract back to the Navy, so that SMA would be given an opportunity to bid competitively on the contract. The Regional Administrator concluded

the mission of the MSB [Minority Small Business] Program as provided in statute, regulation and SOP is best served by this recommendation. Further, leaving contract resolution to the Navy and those qualified disadvantaged firms which would bid in a competitive rather than a sole source environment is also consistent with the best interest of the firms involved and the program objective of

---

**3.** SOP ¶ 46 generally sets forth the Processing Requirements offered for an 8(a) award. SOP ¶ 46(a) sets forth the guidelines for the SBA's exercise of discretion "in selected instances" for

the release of contracts performed by 8(a) concerns for competitive bidding. SOP ¶ 46(g) addresses the review procedure.

developing firms that will be viable in a competitive environment.

16. As discussed below, in December 1987 the SBA evaluated materials concerning whether the SNAP–II contract was necessary for completion of the ISN and TAI business plans. The plaintiffs were afforded the opportunity to make submissions, and to be heard at a meaningful time and in a meaningful manner.

17. In mid-December, 1987, SBA requested the Regional Office to elaborate concerning the needs of ISN and TAI for the SNAP–II contract. The Central Office received the additional information prior to December 21, 1987, as discussed below.

18. By plaintiffs' own admission, counsel for ISN, Peter Velde, met with SBA officials including numerous contacts with SBA's General Counsel, Robert B. Webber, in December 1987, to try and influence SBA's decision to release the requirement pursuant to SOP ¶ 46(e).

19. On December 21, 1987, Delores Ellis, Associate Regional Administrator for Minority Small Business in Philadelphia, forwarded a lengthy analysis and her recommendation to officials in the Central Office that the SNAP–II requirement be released from the 8(a) program. Ms. Ellis concluded that SMA's options on other contracts would not sufficiently ease its transition to competitive status without the opportunity to bid on the SNAP–II contract. In addition, Ms. Ellis noted the following detrimental effects on SMA: 1) the apparent layoffs of approximately two thirds of SMA's employees; 2) the complete utilization of a $17 million line of credit for the contract; and 3) a 5 year lease which SMA had signed at a monthly rental of $2,500. Ms. Ellis specifically determined that TAI and ISN did not need the SNAP–II contract to complete their business plan objectives, that they "have been very successful in their 8(a) marketing activities for the last three fiscal years" and that they would have additional contract opportunities. Ms. Ellis noted that the release of the requirement "does not guarantee the contract for SMA or any other firm." The release of the requirement permitted competitive opportunities for all firms.

20. The record is clear that plaintiffs and their experienced procurement counsel were well aware of SOP ¶ 46(e). This is suggested by the fact that on December 22, 1987, counsel for ISN wrote the Small Business Administration and informed the SBA that it "understood" the policy behind SOP ¶ 46(e).

21. On December 29, 1987, ISN submitted additional information to the SBA, through additional counsel, and at great length, concerning its request for review.

22. On January 5, 1988, the Small Business Administration received a letter from Mark Andrews, on behalf of ISN and TAI, requesting review of the SNAP–II requirement.

23. On January 11, 1988, ISN and TAI representatives again met with SBA officials to present their needs for the SNAP–II contract and on January 12, 1988, TAI made a written submission to the SBA in support of its position.

24. On January 14, 1988, ISN submitted a "needs" paper in support of its position. The plaintiffs actively participated in submitting information to SBA and took every opportunity to express their views that the SNAP–II requirement should not be released from the 8(a) program. It is fair to say that they left "no stone unturned." Their complaints about SMA's so-called "lobbying efforts" lack persuasion when viewed in the entire context of this controversy.

25. In a memorandum dated January 2, 1988, Ms. Ellis, the Philadelphia Associate Regional Administrator for Minority Small Business, evaluated, *inter alia*, the "needs" papers of the plaintiffs. Ms. Ellis determined that the SNAP–II contract was unnecessary for completion of ISN and TAI's business plan objectives. In fact, the "needs" papers identified a backlog of contract support of $50 million for TAI. ISN had a backlog of $21 million for FY 1988. The SBA Regional Office further recommended that the requirement be released so that SMA could compete with other small and disadvantaged firms, including

the plaintiffs. Furthermore, the SBA Central Office later confirmed that ISN received a $23.1 million commitment on January 26, 1988 from the Air Force in support of its business plan.

26. On January 26, 1988, the SBA declined the Navy's offering of the SNAP–II requirement to SBA under the 8(a) program. It released the SNAP–II requirements from the 8(a) program for competitive procurement so that SMA, the plaintiffs and other small and disadvantaged businesses could compete for the contract under the Department of Defense Small and Disadvantaged Business Program, or as a small business set-aside. The SBA concluded that this action was appropriate based on its extensive review of the situation. SMA had expended its line of credit of $17 million in anticipation of the contract and made other financial commitments in anticipation of receipt of the SNAP–II contract. SBA determined that TAI and ISN did not require the SNAP–II contract for completion of their business plan objectives, and that they could also compete for the contract against SMA.

27. The Navy followed SBA's recommendation and issued a Commerce Business Daily Notice that was published on February 5, 1988. The notice identified the SNAP–II requirements, stated the Navy's intention to conduct a competitive set-aside for small disadvantaged businesses, and solicited expressions of interest.

28. It is well settled that competition is the preferred method of government contracting. The SBA decision to provide all small and disadvantaged firms with an opportunity to compete for the SNAP–II contract was a rational decision which was based on a consideration of all the relevant factors, after all the interested parties had an opportunity to present their views.

29. The SBA reviews approximately 4,000 8(a) contracts annually and determines whether these contracts will further the interests of small business. In this case, the Small Business Administration conducted a detailed and thorough review of the information necessary to complete its discretionary analysis of the SNAP–II

requirement for release from the 8(a) program. The decision to release the requirement was made with the input of the plaintiffs and in accordance with the Small Business Administration's general policy of assisting small businesses.

30. The public interest would be harmed if SBA's operations and decisions pursuant to SOP ¶ 46(e) were enjoined. The SBA would be significantly impaired in completing its mission to assist small businesses if it were not allowed the discretion to examine, on a case by case basis, whether a specific contract should be released from the 8(a) program for the benefit of small businesses. In addition, the public interest does not warrant the relief requested by plaintiffs.

31. Release of a Request for Proposals (RFP) anticipated. In the event that the Navy is required to return the SNAP–II requirements to the 8(a) program, the competitive RFP would have to be cancelled. Moreover, the time already expended by the Navy in preparing and conducting the small disadvantaged business competition would be lost, making it unlikely that a fully priced SNAP–II contract could be awarded by July.

## II.

## CONCLUSIONS OF LAW

### A. *SOP ¶ 46(e) Was Not A Rule*

■ 1. SOP ¶ 46(e) is exempt from the notice and comment procedures required under § 553(b) of the Administrative Procedure Act as discussed below. 5 U.S.C. § 553(b) (1982).

2. An agency's pronouncement is a general policy statement, as opposed to a binding norm or a rule, if it "genuinely leaves the agency and its decision-makers free to exercise discretion." *American Bus Assn. v. United States*, 627 F.2d 525, 529 (D.C. Cir.1980). SOP ¶ 46(e) is a general statement of policy and procedure. While it sets forth certain policy guidelines, it leaves the SBA decision-makers free to exercise their discretion in deciding whether to reject or retain a contract in the 8(a)

program. This is consistent with 13 C.F.R. ¶ 124.301(b)(5), which specifically provides that the "SBA is not required to make an award of any particular contract, and should it make an award, SBA is not required to award a contract to a particular 8(a) concern."

3. Contrary to plaintiffs' allegations, SOP ¶ 46(e) is *not* promulgated based upon 13 C.F.R. ¶ 124.301(b)(8) which requires an adverse impact determination prior to the acceptance of a *new procurement* into the 8(a) program. *San Antonio General Maintenance v. Abdnor*, CA 87–1861 (D.D.C. Nov. 16, 1987), is not to the contrary. In that case the court indicated that:

> Section 124.301(b)(8) states: 'SBA will not accept for 8(a) award *proposed procurements not previously in the section 8(a) program* if any of the following circumstances exist ... These regulations do not therefore apply to this case.' (emphasis added)

*Id.* at 15.

4. SOP ¶ 46(e) is a non-binding general statement of policy, and not a rule. As such, it is exempt from the notice and comment procedures set forth in the Administrative Procedure Act. 5 U.S.C. § 553(b)(A) (1982). *See also American Hospital Association v. Bowen*, 834 F.2d 1037, 1053 (D.C.Cir.1987); *American Bus Association v. United States*, 627 F.2d 525, 528 (D.C.Cir.1980).

5. The case of *Misso Services Corporation v. United States Small Business Administration*, No. 81–0283 (D.D.C.1981), relied upon heavily by plaintiffs, is distinguishable from the instant case. This is so because SOP ¶ 46(e) was a published standard operating procedure known to plaintiffs. It enunciates a purely discretionary policy statement which leaves the SBA and its decision-makers free to exercise their discretion. *American Bus Association v. United States*, 627 F.2d 525, 529 (D.C.Cir. 1980). *Misso*, by contrast, involved an unpublished memorandum articulating a mandatory rule prohibiting broker dealers from receiving 8(a) contracts.

6. In conclusion, SOP ¶ 46(e) is not a substantive rule requiring notice and comment, because it is a general statement of policy and procedure for the Small Business Administration to use in its discretion to review and determine assistance to small businesses. 5 U.S.C. § 553(b)(A). *See also Pacific Gas & Electric Co. v. Federal Power Commission*, 506 F.2d 33, 38 (D.C.Cir. 1974); *American Hospital Association v. Bowen*, 834 F.2d 1037, 1052 (D.C.Cir.1987).

**B. Assuming The Validity of SOP ¶ 46(e) as a Policy Statement, Plaintiffs Have Failed to Prove Any Arbitrary or Capricious Actions**

7. SBA records set forth a reasonable basis for the SBA's decision. The actions of the SBA defendants were not, therefore, arbitrary and capricious under 5 U.S.C. § 706(2)(A) (1982), but rather were fully supported by the evidence.

8. The scope of review under the arbitrary and capricious standard "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicles Manufacturers Assoc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). *See also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1298 (D.C.Cir.1971). SBA has examined the relevant data and articulated a satisfactory explanation for its action, including "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866 (quoting *Burlington Truck Lines Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). *See also American Electric Co. v. United States*, 270 F.Supp. 689, 691 (D.Hawaii, 1967); *Springfield White Castle Co. v. Foley*, 230 F.Supp. 77, 78 (W.D.Mo.1964). The SBA decision to return the SNAP–II requirements to the Navy for competitive bidding was based on a consideration of all relevant factors. *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The SBA decision to release the SNAP–II

requirement was not a departure from the established policy and practice.

### C. *The SBA Did Not Arbitrarily And Capriciously Fail To Approve The Navy's Recommendation Of Plaintiffs For the Snap–II Contract*

9. The Small Business Administration was not required to accept the SNAP–II requirements from the Navy for performance in the 8(a) program. 13 C.F.R. § 124.301(b)(5) (1982) provides that the "SBA is not required to make an award of any particular contract, and should it make an award, SBA is not required to award a contract to a particular 8(a) concern." The above-mentioned regulation was not intended to confer substantive or procedural rights on participating 8(a) firms, but rather was designed to aid procuring agencies.

10. The mere offer of a contract to the 8(a) program does not create a binding contract with the Navy because, as noted, the Small Business Administration is not required to accept the contract for the program. 13 C.F.R. § 124.301(b)(5) (1982).

11. The standard method for government procurement as contained in the Competition In Contracting Act (CICA) of 1984, Pub.L. 98–369, is competition.

12. The Small Business Administration can reject a contract offered by a procuring agency in accordance with 13 C.F.R. § 124.301(b)(5).

■ 13. Thus, the Small Business Administration was not required to award the SNAP–II contract to TAI and ISN, even though they were recommended by the procuring agency. Even assuming *arguendo* that the Small Business Administration was required to accept the SNAP–II contract into the 8(a) program, SBA was not bound to award the contract to TAI and ISN. 13 C.F.R. § 124.301(c)(5).

14. The plaintiffs have failed to demonstrate any binding contract between the United States Navy and the Small Business Administration that was developed for their benefit. *Ables v. United States*, 2 Cl.Ct. 494, 500 (1983), *aff'd* 732 F.2d 166 (Fed.Cir.1984).

15. Thus, the Small Business Administration owed no contractual obligations to TAI or ISN, in connection with the Navy's offer letter or otherwise.

### D. *The Navy Did Not Act In An Arbitrary And Capricious Manner*

16. The September 30, 1987 tripartite agreements between SMA, Navy and SBA provided only for an agreement to definitize (*i.e.,* "price") the SNAP–II options before SMA's graduation date of October 21, 1987. The agreements did not bind SBA and the Navy through 1991, as plaintiffs allege.

17. The plaintiffs have failed to prove that they are third party beneficiaries of a government contract because they have not demonstrated the government's promises were made for their direct and specific benefit. *ATC Petroleum Inc. v. Sanders*, 661 F.Supp. 182 (D.D.C.1987).

18. "Before an individual who is not a party to an agreement may sue for a breach of that agreement 'he must at least show that it was intended for his direct benefit'." *Ables v. United States*, 2 Cl.Ct. 494, 500 (1983).

■ 19. The plaintiffs have no entitlement to precontract costs because they have not demonstrated that the actions of the defendants induced them to incur these costs, or that the SBA and Navy employees had authority to do so. Contractors who deal with government employees have a duty to ascertain accurately the employees' actual authority as granted by applicable statute and regulations and may not rely upon the actions of employees who lack such authority. *Inter–Tribal Council Nevada Inc.*, IBCA 1234–12–78, 83–1 BCA 16 433.

### E. *Plaintiffs Were Not Denied Their Due Process Rights*

20. The Plaintiffs were not denied due process as they allege. They had knowledge of the published standard operating procedure, and were given an ample opportunity to present their views and be heard.

21. The plaintiffs were not denied due process when the SBA failed to respond within 10 working days to the offer letter of the United States Navy. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). The additional time was utilized by the Small Business Administration for the benefit of the plaintiffs, as well as other interested parties. The additional time permitted plaintiffs to make repeated detailed submissions to the Small Business Administration, and to meet with Small Business Administration officials. Moreover, plaintiffs stated that they "understood" the policy behind SOP ¶ 46(e). Plaintiffs were provided with ample opportunity to present their views before the SBA reached its final decision.

### F. *Defendants Are Not Liable For Harm*

22. The federal officials acting in accordance with SOP ¶ 46(e) are not liable for any harm or damages that plaintiffs may have suffered. The conduct of the SBA officials in reviewing the SNAP–II contract was clearly "discretionary" in nature and "within the outer perimeters" of their official duties. *Westfall v. Erwin*, —— U.S. ——, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988). Thus, defendants Abdnor, Webber and Gonzalez are not liable under the analysis set forth in *Westfall*, 108 S.Ct. at 585.

### G. *Plaintiffs Were Not De Facto Suspended From The 8(a) Program*

23. Plaintiffs' allegation that TAI has been *"de facto"* suspended from the 8(a) program lacks merit. Plaintiffs assert that TAI is entitled to an extension of its graduation date pursuant to 13 C.F.R. § 124.113(c). That provision states in relevant part that:

> If *all* program assistance to a section 8(a) business concern has been suspended under these regulations, and that concern's participation in the program is not terminated, an amount of time equal to the duration of the suspension will be

added to the concern's fixed program participation term (emphasis added).

TAI has failed to offer any evidence that "all" program assistance to it has been suspended or terminated.

### H. *SBA Did Not Violate The National Defense Authorization Act for FY 1988 & 1989, Pub. Law 100–180, Section 806(b)(f) or DOD Policy*

24. The plaintiffs have not shown that the Small Business Administration violated either the Department of Defense (DOD) policy to retain the level of 8(a) contracts, or the National Defense Authorization Act for FY 1988 & 1989, Pub. Law 100–180, by allowing competitive bidding on the SNAP–II contract under the Navy's small and disadvantaged business program. In any case, SBA is not bound by DOD policy.

Thus, plaintiffs are not entitled to judgment pursuant to any of their eight (8) counts.

An order consistent with the foregoing has been entered this day.

### ORDER

In accordance with the Findings of Fact and Conclusions of Law issued this 21st day of April 1988, it is

ORDERED that this case be dismissed with prejudice.