860 F.2d 1104
 274 U.S.App.D.C. 12, 57 USLW 2360,
35 Cont.Cas.Fed. (CCH) 75,585
 ATC PETROLEUM, INC., et al., Appellants,
v.
John C. SANDERS, Administrator, Small Business Administration.
KOCH FUELS, INC., Appellant,
v.
John C. SANDERS, Administrator, Small Business Administration.
 Nos. 87-5162, 87-5179.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 17, 1988.
Decided Nov. 4, 1988.
As Amended Nov. 25, 1988.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action Nos. 85-00828 and 85-03701).
 Edward J. Tolchin, Washington, D.C., for appellants ATC Petroleum, Inc. and Tidewater Fuels, Inc. in No. 87-5162.
 Louis K. Obdyke, with whom William E. Shull, Wichita, Kan., and Larry P. Ellsworth, Washington, D.C., were on the brief, for appellant Koch Fuels, Inc. in No. 87-5179.
 Michael J. Ryan, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Claire M. Schenk, Atty., Small Business Admin., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.
 Eric S. Benderson, Associate Gen. Counsel, Small Business Admin. and George P. Williams, Asst. U.S. Atty., Washington, D.C., also entered appearances for appellee.
 Before WILLIAMS, D.H. GINSBURG and BOGGS*, Circuit Judges.
 Opinions for the Court filed by Circuit Judge D.H. GINSBURG.
 D.H. GINSBURG, Circuit Judge:
 
 
 1
 These two cases arise out of two contracts, let under the section 8(a) program established by the Small Business Act of 1958 (the Act), between the Small Business Administration (SBA) and the Defense Fuel Supply Center (DFSC); related subcontracts between SBA and a supplier of fuel oil, Tri-Par Combustion Corp.; and further subcontracts between Tri-Par and appellants Koch Fuels, Inc. (No. 87-5179), and ATC Petroleum, Inc. and Tidewater Fuels, Inc. (No. 87-5162). Appellants raise various equitable claims to recover from SBA the considerable losses they allegedly incurred as a result of steps taken by SBA to collect money owed it by Tri-Par.
 
 
 2
 The district court granted summary judgment on all counts to SBA. Although we agree with the district court's conclusion that equitable estoppel will not lie against SBA, we reverse in part and remand the case for further proceedings on another aspect of appellants' claims.
 
 I. BACKGROUND
 
 3
 Before discussing the facts of these cases in greater detail, we briefly review the salient features of the section 8(a) program.
 
 A. Statutory Framework
 
 4
 Section 8(a)(1) of the Act, 15 U.S.C. Sec. 637(a)(1) (1982), authorizes the SBA,
 
 
 5
 whenever it determines such action is necessary or appropriate--
 
 
 6
 (A) to enter into contracts with the United States Government and any department, agency, or officer thereof having procurement powers obligating the [SBA] to furnish articles, equipment, supplies, services, or materials to the Government ...; [and]
 
 
 7
 (C) to arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns....
 
 
 8
 The Act further provides that a socially or economically disadvantaged small business shall be eligible for this type of SBA assistance only if the agency determines that the benefited small business "will be able to perform [such] contracts ... and has reasonable prospects for success in competing in the private sector." 15 U.S.C. Sec. 637(a)(1) (1982). Additionally, SBA may assist a qualified small business in performing its SBA contracts by providing technical and management support. 15 U.S.C. Sec. 637(b)(1)(A) (1982).
 
 
 9
 A section 8(a) firm may also obtain financial support from SBA under the agency's "advance payment" program, which provides an interest-free loan to assist the firm in performing procurement subcontracts. Such a loan may be made, however, only if SBA finds that the "public interest" so requires and that the loan is backed by "adequate security." Adequate security may consist of a "lien in favor of the Government on the property contracted for, on the balance of an account in which such payments are deposited, and such of the property acquired for performance of the contract as the parties may agree." 41 U.S.C. Sec. 255(c) (1982).
 
 
 10
 Because of the considerable risk of loss attending advance payment to section 8(a) firms that are not otherwise creditworthy, SBA regulations further limit advance payment loans to cases in which: (1) the "section 8(a) business concern does not have adequate working capital to perform a specific section 8(a) contract"; (2) other methods of financing are either unavailable or "not conducive to the effective and or business development purposes of the section 8(a) program"; and (3) "[t]he section 8(a) business concern has established or agrees to establish and maintain financial records and controls which will provide for complete accountability and required reporting of advance payment funds." 13 C.F.R. Sec. 124.1-2(b).
 
 
 11
 The regulations also provide that the section 8(a) firm must establish a "special bank account for the deposit of payments paid to it by the procuring agency pursuant to the performance subcontracts" and for the deposit of the advance payment funds. 13 C.F.R. Sec. 124.1-2(c). Disbursements from this account may be made only with the countersignature of a designated SBA official, 13 C.F.R. Sec. 124.1-2(c)(1)(A), and advance payment funds may be disbursed only "for the purpose of purchasing materials and labor and paying for administrative and overhead expenses required to perform the specific section 8(a) subcontract." 13 C.F.R Sec. 124.1-2(d)(1). SBA obtains, at the time of making advance payment, "a lien upon the special bank account, any property contracted for, and supplies, material and other property acquired with the advance payment funds." 13 C.F.R. Sec. 124.1-2(c)(1)(C). The small business concern is forbidden from withdrawing proceeds from the special bank account "before the full amount of the advance payments is liquidated." 13 C.F.R. Sec. 124.1-2(a).
 
 B. The Contracts
 
 12
 Over a period of years, SBA entered into various contracts with Tri-Par pursuant to the section 8(a) program. In 1976, Tri-Par approached appellant Koch to serve as its supplier of fuel oil in connection with some of these contracts. Koch initially declined to do business with Tri-Par because Tri-Par failed to satisfy Koch's credit requirements. SBA intervened on Tri-Par's behalf, informing Koch Fuels that
 
 
 13
 [t]his office will furnish sufficient funds in the form of an advance payment which will permit the timely payment of your invoices for the fuel furnished by your company. These funds will be deposited in a special bank account under the control of this office and all checks drawn on this account will be signed by the SBA authorized representative. The account will remain under the control of this office at all times.
 
 
 14
 On the basis of these assurances, which were repeated for other contracts in 1978 and 1979, Koch Fuels supplied fuel oil to Tri-Par on credit.
 
 
 15
 In September 1980, SBA entered into an indefinite requirements contract to provide fuel oil to the DFSC, and chose Tri-Par as its section 8(a) subcontractor. As a result, Tri-Par became obligated to supply DFSC with approximately $10.8 million worth of fuel oil during fiscal year 1981. Koch Fuels agreed to serve as Tri-Par's supplier in connection with this contract.
 
 
 16
 In January 1981, Tri-Par encountered financial difficulties and, unable to secure financing in the private sector, the company requested a loan from SBA under the agency's advance payment plan. SBA agreed to deposit $4.2 million in advance payments into a special bank account established by agreement between Tri-Par and SBA, and the 1980 subcontract was modified to account for the advance payment. The modification required that all payments under the contract "be marked for deposit only in a Special Bank Account," the administration of which "will be performed by SBA Contracting Officer, New York District Office...." The modification also specified: (1) "SBA shall have a lien upon any balance in the Special Bank Account paramount to all other liens, which lien shall secure the repayment of any advance payments made hereunder"; (2) "SBA shall have a lien on all proceeds received or to be received by virtue of the performance of this contract"; and (3) SBA shall have a "lien on property under contract." A copy of the contract modification was forwarded to DFSC.
 
 
 17
 On June 4, 1981, SBA entered into another, entirely separate, contract with DFSC for the delivery of $12.2 million of fuel to DFSC installations in the southeastern United States. Again, SBA subcontracted with Tri-Par under section 8(a). Tri-Par met its fuel supply requirement under this subcontract through agreements with appellants Tidewater Fuels, Inc. and ATC Petroleum, Inc. (hereinafter collectively referred to as TF/ATC). SBA made no advance payments to Tri-Par in connection with this subcontract.
 
 
 18
 In July 1981, SBA discovered that DFSC payments under the 1980 contract were not being deposited into the special account. Tri-Par acknowledged that some DFSC payments under the 1980 contract had been deposited in the company's regular business account, and had been used for purposes unrelated to Tri-Par's performance of the contract. SBA later ascertained that Tri-Par had received in excess of $6.8 million in payments on the 1980 contract, but that the funds deposited in the special account were $1.3 million short of the amount needed to repay SBA the money it had advanced. On September 23, 1981, SBA issued stop payment orders to all receiving and paying authorities, and requested DFSC to make all further payments on the 1980 contract directly to it. Through this procedure, SBA recovered approximately $660,000 of the outstanding $1.3 million Tri-Par debt. Upon learning of these actions in September 1981, Koch refused to make further deliveries of fuel oil. At that time, Tri-Par owed it about $496,000 for deliveries made in August and September 1981.
 
 
 19
 Meanwhile, TF/ATC continued to supply Tri-Par with fuel oil in connection with the 1981 DFSC contract. Until October 1981, Tri-Par made timely payments to TF/ATC. When payments became overdue in late October and early November, TF/ATC contacted Tri-Par, which informed it that the delays were due to late payments from DFSC, but that appropriate corrective measures were being taken. Reassured, TF/ATC continued to supply DFSC with fuel oil, on behalf of Tri-Par, under the 1981 contract.
 
 
 20
 During this period, SBA was studying ways in which it could recover the remainder of the funds owed it by Tri-Par in connection with the advance payment loan for the 1980 contract. SBA determined that recovery could be had through a procedure known as "administrative offset" whereby payments from DFSC owed to Tri-Par under other contracts could be appropriated and applied to reduce Tri-Par's indebtedness to SBA. See 31 U.S.C. Sec. 3716 (1982); 4 C.F.R. Sec. 102.3(a) (1988); 13 C.F.R. Sec. 140.1 et seq. (1988).
 
 
 21
 In late December 1981, TF/ATC became more concerned as Tri-Par payments remained late. TF/ATC requested of Tri-Par that a jointly controlled bank account be established, and that DFSC's contract payments be deposited directly into it. Tri-Par agreed; TF/ATC and Tri-Par then sought DFSC's approval of this arrangement. On December 21, 1981, TF/ATC officials met with a DFSC lawyer. According to an affidavit from ATC's credit manager, the DFSC lawyer informed the company that, on December 9, SBA had issued stop orders on DFSC payments to Tri-Par under the 1981 contract, that TF/ATC had been "set up" by SBA, and that "DFSC may not comply with SBA's demand because DFSC was uncomfortable with SBA's actions."
 
 
 22
 TF/ATC then contacted SBA, which acknowledged that it intended to "offset" Tri-Par's indebtedness to the agency by appropriating DFSC payments due under the 1981 contract. According to a TF/ATC affidavit, an SBA official informed TF/ATC that the agency had been waiting for the "right time" to assert a set-off.
 
 
 23
 Notwithstanding its initial misgivings, DFSC ultimately complied with SBA's demand for the set-off. As a result, SBA recovered the entire amount Tri-Par owed it on the advance payment loan in connection with the 1980 contract, but TF/ATC was not paid in full for the fuel oil it supplied in connection with the 1981 contract. At oral argument, counsel for Koch informed the court that Tri-Par had filed for bankruptcy in 1983, and that its obligations to the appellants remained unsatisfied.
 
 C. Proceedings in the District Court
 
 24
 Unable to obtain payment from Tri-Par, Koch and TF/ATC filed separate suits against SBA. Koch sought relief on four counts designated: (1) contract by estoppel; (2) unjust enrichment, constructive trust, and equitable lien; (3) SBA's actions were void as against public policy; and (4) breach of a contract as to which Koch was a third-party beneficiary. TF/ATC filed a joint complaint also seeking relief on four counts denominated: (1) equitable lien; (2) breach of regulatory and contractual duties; (3) equitable estoppel; and (4) equitable relief. The cases were consolidated before the district court.
 
 
 25
 Upon SBA's motion for summary judgment, the district court determined that "no material issue of fact blocks the way to a judgment in [SBA's] favor on the law.... The only conflict lies in the characterization of certain actions on the SBA's part in view of the legal theories proffered by plaintiffs." ATC Petroleum, Inc. v. Sanders, 661 F.Supp. 182, 186 (D.D.C.1987).
 
 
 26
 The court held generally that "SBA enjoys the safety of the high ground" because "[a]s an integral part of the federal government's endeavoring to fulfill its statutory mandate, the SBA is immune from plaintiffs' equitable challenges." Id. at 186-87 (citing Portmann v. United States, 674 F.2d 1155, 1160-61 (7th Cir.1982) and American Savings v. Bell, 562 F.Supp. 4, 8 (D.D.C.1981)). More specifically, the court noted that "there is a traditional reluctance to apply the doctrine [of equitable estoppel] against the government ... particularly ... where the government ... is acting in its 'sovereign capacity' as opposed to its 'proprietary capacity.' " Id. at 187.
 
 
 27
 The district court found that there was "no reliable evidence" of "any affirmative misconduct on the SBA's part in extending the advance payment loan or in liquidating it," which, in the court's view, was a necessary element of an equitable claim against the government. Instead, the court concluded, "[t]he SBA acted pursuant to proper statutory authority to recover the advance loan payment as a priority creditor." Id. at 188 (citing 41 U.S.C. Sec. 255(c) (1982); 4 C.F.R. Sec. 102.3 (1986); and 13 C.F.R. Sec. 124.1-2 (1986)).
 
 
 28
 The court rejected Koch's claim that SBA should be estopped by virtue of the representations the agency made in order to induce Koch to supply fuel oil to Tri-Par on credit: "As a general rule, the government is not bound by the statements or assurances of its officers where the actual authority to make such statements or assurances is lacking." Id. (citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) and National Treasury Employees Union v. Reagan, 663 F.2d 239, 249 (D.C.Cir.1981)). In this case, the court concluded, "[a]ny payment, or guarantee of payment, to plaintiffs by the SBA would have been in contravention of SBA regulations, as well as the federal statute that authorizes the government to extend such advance payment loans," and "by failing to ascertain the legal parameters of the SBA's authority, plaintiffs failed to act reasonably." Id.
 
 
 29
 The court also rejected the "equitable lien" theory advanced by TF/ATC and Koch, both of which relied upon our decision in Trans-Bay Engineers & Builders, Inc. v. Hills, 551 F.2d 370 (D.C.Cir.1976). In the district court's view, "no reading of the evidence would cast Tri-Par as a 'creature' of the SBA" which, under Trans-Bay, it believed was the critical factual predicate for imposing an equitable lien in favor of Koch or of TF/ATC. ATC, 661 F.Supp. at 189.
 
 
 30
 Finally, the court disposed of the remaining claims by concluding that "plaintiffs may not rely on the SBA's admittedly poor supervision of the special bank account to establish liability"; that the plaintiffs had failed to demonstrate that SBA was unjustly enriched such that an implied-in-law contract had been established; and that Koch had not alleged facts that would enable it to recover as a third-party beneficiary of the contracts between SBA and Tri-Par. Id. at 190.
 
 II. ANALYSIS
 
 31
 The district court properly granted summary judgment in favor of SBA only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [SBA] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has made plain, however, it is not enough merely that some facts are in dispute: "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE Sec. 2725 at 93-95 (1983)). That is, the factual disputes must be material, and "the substantive law will identify which facts are material." Id. Of course, " '[o]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).
 
 
 32
 Koch's primary claims on appeal, cast variously in terms of "equitable estoppel," "unjust enrichment," "equitable lien," and more simply, "equitable relief," all reduce to a very simple proposition: SBA should not be allowed to appropriate payments DFSC made under the 1980 contract because SBA failed to do what it specifically assured Koch it would do--viz., in Koch's words, "closely supervise the bank account that [SBA] had set up for Tri-Par and verify that all monies destined for the special bank account would be deposited there and that no improper payments would be permitted." This omission, coupled with the agency's failure promptly to inform Koch of problems with the special account, the company maintains, "are the direct and proximate cause of Koch's injury and losses."
 
 
 33
 TF/ATC's claims, though similar, do not rest on any explicit representations made by SBA. Instead, TF/ATC claims that SBA "set up" Tri-Par's suppliers under the 1981 contract by sitting on its hands for months, knowing that they would deliver to DFSC fuel for which they would not be paid if SBA could prevent it. Then, when those deliveries obligated DFSC to make payments under the 1981 contract sufficient to cover SBA's losses in connection with the 1980 contract, SBA did prevent the suppliers from being paid by strategically and unjustly appropriating those payments to itself through the device of "administrative offset."
 
 
 34
 In both cases, the questions for this court are whether inferences that properly may be drawn from the record support the appellants' characterization of the facts, and if so, whether SBA would be liable on those facts. We agree with the district court, although for a different reason, that summary judgment was appropriate with respect to appellants' claims of "equitable estoppel." Nonetheless, we believe that appellants have alleged sufficient facts to preclude entry of summary judgment for SBA on their claims of unjust enrichment.A. Equitable Estoppel
 
 
 35
 The doctrine of equitable estoppel is not, in itself, either a claim or a defense. Rather, it is a means of precluding a litigant from asserting an otherwise available claim or defense against a party who has detrimentally relied on that litigant's conduct. See generally 3 J. POMEROY, EQUITY JURISPRUDENCE Sec. 804, at 189 (5th ed. 1941); Note, Equitable Estoppel of the Government, 79 COLUM.L.REV. 551, 552 (1979). Thus, a plaintiff seeking the benefit of equitable estoppel must have some claim, sounding in equity or in law, that otherwise entitles it to prevail against the defendant.
 
 
 36
 The circumstances in which the government may be estopped from asserting a claim or a defense are not well-defined, but "it is well settled that the Government may not be estopped on the same terms as any other litigant." Heckler v. Community Health Serv., 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) (footnote and citations omitted). Indeed, the Supreme Court has never expressly applied the doctrine against the government, and regards as open the question whether the government may be estopped under any circumstances. See id.; Lyng v. Payne, 476 U.S. 926, 106 S.Ct. 2333, 2340, 90 L.Ed.2d 921 (1986). But see United States v. Lazy FC Ranch, 481 F.2d 985, 988 (9th Cir.1973) (suggesting that the Supreme Court applied the "rationale" of equitable estoppel against the government in Moser v. United States, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951)). Similarly, we are aware of no case in which this court has applied the doctrine against the government.
 
 
 37
 We have previously said, however, that "[t]he fundamental principle of equitable estoppel applies to government agencies, as well as private parties." Investors Research Corp. v. SEC, 628 F.2d 168, 174 n. 34 (D.C.Cir.1980) (citing 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE Secs. 17.01-17.04 (1958 & Supp. 1980)). Assuming that to be the case, we think it fair to add that, despite the doctrine's flexibility in disputes between private parties, its application to the government must be rigid and sparing. The case for estoppel against the government must be compelling, and will certainly include proof of each of the traditional elements of the doctrine--" 'false representation, a purpose to invite action by the party to whom the representation was made, ignorance of the true facts by that party, and reliance,' as well as ... 'a showing of an injustice ... and lack of undue damage to the public interest.' " International Org. of Masters, Mates & Pilots v. Brown, 698 F.2d 536, 551 (D.C.Cir.1983) (quoting Hoeber v. District of Columbia Redevelopment Land Agency, 483 F.Supp. 1356, 1365-66 (D.D.C.1980), aff'd mem., 672 F.2d 894 (D.C.Cir.1981)).
 
 
 38
 The district court, as we have seen, concluded that Koch's reliance upon SBA's assurances would not estop the government essentially because: (1) these assurances were "unauthorized"; and (2) "the government is not bound by the statements or assurances of its officers where the actual authority to make such statements or assurances is lacking." ATC, 661 F.Supp. at 188 (citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. at 384, 68 S.Ct. at 3 and National Treasury Employees Union v. Reagan, 663 F.2d at 249).
 
 
 39
 The specific "assurances" that the district court deemed to be "unauthorized" were SBA's alleged statements that it would "obligate advance payment funds to the supplier of a section 8(a) contractor or ... guarantee payment to the supplier in the event of default by the section 8(a) contractor." Id. We agree with the district court that SBA officials have no authority to give assurances of this kind; the agency has no authority to act as a surety of a section 8(a) firm's contractual responsibilities to its suppliers. As the Supreme Court has made clear, parties dealing with the government "are expected to know the law and may not rely on the conduct of Government agents contrary to law." Heckler v. Community Health Serv., 467 U.S. at 63, 104 S.Ct. at 2225 (1984) (footnote and citations omitted); Merrill, 332 U.S. at 385, 68 S.Ct. at 3. Thus, insofar as Koch may have relied upon these alleged assurances, its estoppel claim fails because there is no grave injustice in holding parties to a reasonable knowledge of the law.
 
 
 40
 On appeal, Koch maintains that it relied on more limited and clearly authorized representations of SBA. Specifically, the company claims that SBA assured it that the agency would "closely supervise the bank account that it has set up for Tri-Par and verify that all monies destined for the special bank account would be deposited there and that no improper payments would be permitted."
 
 
 41
 SBA does not deny giving these assurances, nor could it reasonably do so. Its own regulations, as well as its contract with Tri-Par, specifically obligate SBA to carry out the duties that it assured Koch it would perform. See 13 C.F.R. Sec. 124.1-2(b)-(d). For that very reason, however, no resort to "estoppel" is appropriate. For unlike the usual claimant for estoppel against the government, Koch is not claiming that the agency is estopped from acting in accordance with governing law, cf. Heckler v. Community Health Serv., 467 U.S. at 64-66, 104 S.Ct. at 2225-26 (participating provider may not rely upon fiscal intermediary's erroneous interpretation of Medicare regulations); Merrill, 332 U.S. at 385-86, 68 S.Ct. at 3-4 (farmer may not rely upon official's erroneous representation of government crop insurance coverage); instead, it claims that, as a beneficiary of the SBA's account control regulations, it may recover damages proximately caused by SBA's failure to abide by those regulations. This, however, is surely not an equitable claim. Whether Koch is an intended beneficiary of the SBA regulations is a question of law which, we note, Koch has not pressed on appeal.
 
 
 42
 To the extent that Koch claims that an SBA official's restatement of the agency's regulatory obligations created a "fiduciary" relationship between Koch and the agency, or that an enforceable agreement can be inferred therefrom, we disagree. A mere assurance by an agency official that the agency will conform its conduct to the requirements of its own regulations, contrary to Koch's theory, does not create any agency obligation or liability in addition to that arising from the regulations themselves.
 
 
 43
 TF/ATC's estoppel claim, though different, also fails because it has not alleged facts sufficient to support it. TF/ATC suggests that SBA should be estopped from asserting an administrative offset because the agency concealed from TriPar's suppliers the problems it encountered in attempting to recoup the advance payment loan, and that as a result TF/ATC, in ignorance, reasonably relied upon the appearance that there were no such problems.
 
 
 44
 In effecting the offset, SBA acted pursuant to long-recognized authority, see United States v. Munsey Trust, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); moreover, the agency never made any representations to TF/ATC that DFSC payments under the 1981 contract were not subject to administrative offset in the event that Tri-Par defaulted on its obligation to repay the advance payment loan on the 1980 contract. While, as we shall see, the agency's alleged "concealment" of its problems with the advance payment to Tri-Par raises other equitable issues, we do not believe that its silence, standing alone, is sufficient to preclude the agency from later asserting its right to an administrative offset.
 
 
 45
 Although the estoppel doctrine has been applied to preclude a party from profiting by keeping silent when it has a duty to speak, see United States v. Georgia-Pacific Co., 421 F.2d 92, 96 (9th Cir.1970); Management & Investment Co. v. Zmunt, 59 F.2d 663, 664 (6th Cir.1932), we cannot agree that SBA had any specific duty to inform TF/ATC, with whom it had no direct relationship or contract, of its intention to effect an administrative offset in this case. Moreover, a duty to inform in such circumstances would be unduly burdensome and unreasonable in light of the myriad suppliers furnishing services and materials to firms getting loans under the section 8(a) program. Congress has not seen fit to impose such a duty, and we decline to do so absent some considerably more compelling showing of a resulting injustice than that offered by TF/ATC. In these circumstances, it would be difficult, if not outright fictitious, to conclude that ATC reasonably relied upon SBA's silence. We therefore reject ATC's claim that SBA is estopped from asserting its right to an administrative offset. We turn now to appellants' other equitable theories.
 
 B. Unjust Enrichment
 
 46
 The claims of both TF/ATC and Koch, though characterized in various equitable terms, are at bottom based on the theory of unjust enrichment; appellants claim that they have unknowingly conferred a benefit upon SBA by performing contractual responsibilities that obligated DFSC to make payments to Tri-Par for the fuel Koch and TF/ATC provided. These payments were appropriated by SBA, depriving Koch and TF/ATC of payment for fuel sold and delivered, and allegedly bestowing upon SBA benefits to which the agency is not entitled. To avoid this allegedly inequitable result, appellants claim in essence that they are entitled to an "equitable lien" against the DFSC payments that SBA has appropriated.[1]
 
 
 47
 An equitable lien is "a right, not recognized by law, to have a fund or specific property applied to the payment of a particular debt and is based upon the ... equitable doctrine of unjust enrichment." United States v. Mill Ass'n, Inc., 480 F.Supp. 3, 10 (E.D.N.Y.1978) (quoting American Fidelity Fire Ins. Co. v. Construcciones Werl, Inc., 407 F.Supp. 164, 183 (D.V.I.1975)). In Trans-Bay Engineers & Builders, Inc. v. Hills, 551 F.2d 370 (D.C.Cir.1976), we approved the doctrines of unjust enrichment and of equitable lien as a matter of federal common law, and held that these doctrines are available to private parties seeking equitable relief against the government. We must therefore reject at the outset the district court's conclusion that, because SBA was acting in a "sovereign," as opposed to a "proprietary," capacity, the agency is somehow immune from appellants' claims for equitable relief. As Trans-Bay makes clear, the "sovereign" nature of an agency's action does not immunize the agency from the reach of equity. See 551 F.2d at 551-52.[2]
 
 
 48
 In Trans-Bay, a builder contracted with a non-profit corporation, More Oakland Residential Housing, Inc. (MORH), to construct a housing project pursuant to section 236 of the National Housing Act, 12 U.S.C. Sec. 1715z-1. MORH secured mortgage financing for the project from a private lender, which the Department of Housing and Urban Development insured. When MORH defaulted on the mortgage, the private lender assigned its rights to HUD. HUD foreclosed on the mortgage, and appropriated all of the undisbursed mortgage loan proceeds. Trans-Bay, the building contractor, had completed the construction of the project, but had not been fully paid; as a result, it claimed that it was equitably entitled to the loan proceeds appropriated by HUD.
 
 
 49
 We held that Trans-Bay was entitled to an equitable lien against the undisbursed funds in order "to forestall a cosmetic fraud ... and to avoid unjust enrichment [of HUD] from the services rendered." Trans-Bay, 551 F.2d at 382 (footnote omitted). We explained that:
 
 
 50
 This was not a typical marketplace transaction where the contractor relied on the reputation and financial integrity of the owner to pay the construction costs. The owner here was a non-profit community based organization without any significant assets, a fact known to all parties. The court put it pithily in F.W. Eversly & Co. v. East N.Y. Non-Profit HDFC, 409 F.Supp. 791, 796-97 (S.D.N.Y.1976): These "non-profit, no asset corporations were 'creatures of HUD.' " They are not ordinary private commercial ventures, but products of and means for government programs.... HUD argues that [the] loss to the contractor, who fully performed, resulted from a conscious contractual allocation of risk by all the parties involved, and was the result intended by Congress. This simply does not square with our appraisal of the realities, or our notions of good sense and fair dealing.
 
 
 51
 As we have seen, the district court held that Trans-Bay has no application to this case because in the earlier case we found that "MORH was HUD's 'creature,' existing solely because of a 'government inspired social purpose.' " ATC, 661 F.Supp. at 189 (quoting Trans-Bay, 551 F.2d at 382). Such a characterization does not, in the district court's view, as neatly fit Tri-Par's relationship with SBA because:
 
 
 52
 Here, in contrast, the SBA nowhere agreed to insure or subsidize Tri-Par's performance, and no such authority to do so exists. While Tri-Par received SBA technical assistance, subcontract preferences, and occasional short-term loans under the section 8(a) program, no reading of the evidence would cast Tri-Par as a 'creature' of the SBA.
 
 
 53
 We readily agree with the district court that SBA does not "insure" the performance of its section 8(a) subcontractors, but we cannot agree that SBA did not "subsidize Tri-Par's performance." The technical and managerial assistance provided by the agency is without cost to the small business and the short-term advance payment loans are interest-free. This is clearly a government-bestowed subsidy. Moreover, it seems that, without such governmental assistance, Tri-Par stood little chance of survival in the fiercely competitive market either for government or for private fuel contracts. Indeed, evidence of record--SBA's own annual review of the firm--indicates that as of 1981, after nearly seven years as a participant in SBA's section 8(a) program, Tri-Par's principals had not yet "gain[ed] the requisite tools to successfully manage the firm," that Tri-Par was still unable to present itself as creditworthy in the private sector, and was "still unable to finance its contracts via commercial means"; and that Tri-Par's activities, 71 percent of which were government sales under the section 8(a) program, suggested "a planned dependence on 8(a) support." ATC contends, and SBA does not dispute, that "no supplier would ever have dealt with Tri-Par on credit absent government support."
 
 
 54
 Tri-Par's heavy dependence upon SBA subsidies, we agree with the district court, is not enough to bring this case within the rationale of Trans-Bay. Such dependence does not render Tri-Par a mere conduit or "creature" "for the convenience of the government"--in essence a separate entity in name only--through which SBA sought to achieve its own objectives. Cf. Trans-Bay, 551 F.2d at 382 ("[T]he no-asset owner was created and permitted to enter into the agreements for the convenience of the government in effectuating the [federally-subsidized housing] program."). As the district court noted, moreover, SBA enjoys a statutory lien against all funds paid or to be paid into the special account, see ATC, 661 F.Supp. at 189-90 (citing 41 U.S.C. Sec. 255(c) (1982)), a fact readily ascertainable by all parties from an examination of SBA's contract with Tri-Par and from applicable law.
 
 
 55
 There is more to this case, however. The value of SBA's security--its statutory lien--depended upon the size of the pool of funds to which that lien attached. The size of that pool, in turn, depended upon two factors: (1) SBA's control and supervision of the special account; and (2) Tri-Par's performance of the 1980 contract, which would obligate DFSC to make payments into the account for the fuel delivered to it. Given Tri-Par's precarious financial condition, and its lack of assets, it goes without saying that the interests of Tri-Par's other creditors, like Koch, were also dependent upon the pool of funds to which SBA's lien attached.
 
 
 56
 Koch alleges that SBA's security, and its own, were placed at risk because the agency failed to act reasonably; it did not closely supervise, monitor, or control the flow of DFSC payments into the special account.[3] DFSC payments to Tri-Par were not, in fact, deposited into the special account; as a consequence, the pool of funds to which SBA's lien attached was considerably smaller than it otherwise should have been, thereby exposing both SBA and Koch to considerable losses. SBA, however, had available to it another means of protection. It could allow Koch to continue to supply fuel, enabling Tri-Par fully to perform its duties under the 1980 contract, which in turn, would obligate DFSC to enlarge the pool of funds. The record suggests that this is precisely what SBA chose to do.
 
 
 57
 Koch's continued delivery of fuel in service of Tri-Par's contractual responsibilities after SBA discovered that DFSC payments were not properly deposited into the special account, together with SBA's dereliction in its supervision of the special account in the first place, clearly raises the question whether SBA has been unjustly enriched at Koch's expense. After discovering that its security was wanting, the agency presumably made a calculated effort to reduce its considerable risk of loss. That, of course, would not be a ground for subjecting the agency to liability, unless SBA decided to minimize its losses in a manner patently unfair to appellants. If SBA sat idly by for some months as Koch, in essence, serviced Tri-Par's debt, specifically in order to shift to Koch the consequences of the agency's own mishandling of the account that served as Koch's security as well as its own, then the result is surely inequitable. An SBA memorandum does indicate that the agency's examination of Tri-Par's bank statements in July 1981 "trigger[ed] an alarm," and yet the agency did not until late September of that year send an accountant to review Tri-Par's records. Without more, the inference that SBA intended to use Koch to service Tri-Par's outstanding debt is not compelling, but neither is it so implausible that it can be dismissed out of hand. Cf. Matsushita Elec., 475 U.S. at 587-88, 106 S.Ct. at 1356. Since SBA introduced no evidence to explain why it delayed taking action for approximately two months, the inference must be drawn in Koch's favor.
 
 
 58
 In these circumstances, we conclude that Koch's claim raises a genuine issue, not amenable to treatment under Rule 56(c), whether its continued performance bestowed a benefit upon SBA that the agency was not, in equity, entitled to retain. For unlike the district court, we do not believe that SBA's statutory lien entitles the agency to liquidate Tri-Par's debt by means of what we called in Trans-Bay "a cosmetic fraud based on the niceties of the [agency's] contractual arrangements...." 551 F.2d at 382. As a court of equity, the district court "may subordinate a claim because of equitable considerations." Kennedy Elec. Co. v. United States Postal Service, 508 F.2d 954, 957 (10th Cir.1974). Reading the record in a light most favorable to appellants, we believe that Koch has made out a colorable case for an equitable lien superior to SBA's otherwise paramount security interest.[4]
 
 
 59
 TF/ATC's claim for an equitable lien against the DFSC payments under the 1981 contract stands on a different footing from Koch's claim to a lien against the 1980 contract payments. For SBA's lien extends no farther than the security interest for which it contracted with Tri-Par and the statute pursuant to which the advance payment loan was made. Both the statute and the contract provide that SBA's security for the advance payment loan consisted in funds paid or to be paid into the special bank account. It plainly did not encompass DFSC payments under the 1981 contract, because those payments were not earmarked for deposit in the special account. Accordingly, SBA's lien does not extend to the payments made by DFSC under the 1981 contract.
 
 
 60
 SBA's sole claim to these payments arises from its statutory authority to effect an "administrative offset." See 31 U.S.C. Sec. 3716.[5] The authorizing statute does not necessarily grant priority to SBA's claims in the circumstances of this case, however. Other factors may still provide TF/ATC with an equitable lien superior to the agency's right to an administrative offset.[6]
 
 
 61
 The record evidence raises a genuine question whether SBA "set up" TF/ATC by waiting for just the "right time" to effect an administrative offset. We have also seen that SBA's exposure to loss, by virtue of Tri-Par's diversion of the 1980 contract proceeds, may be attributable to the agency's own failure reasonably to do what it was obligated by its regulations and by contract to do, i.e., supervise, monitor, and control the special bank account.
 
 
 62
 As was also arguably true with respect to Koch's claim, Tri-Par appears to have become a mere conduit, or SBA's "creature," through which the agency could undeservingly reap the benefit of TF/ATC's delivery of fuel oil. While SBA claims that it is Tri-Par that has been most undeservedly enriched by TF/ATC's deliveries of fuel to DFSC, the evidence bespeaks an undeniable benefit to SBA; the agency fully recovered losses it almost certainly would have incurred if TF/ATC had known early on of SBA's plan to effect an offset and thus refused to make further deliveries. The reasonableness of TF/ATC's actions after it did, in fact, learn of SBA's intention is a question that cannot be resolved on the record before us. For present purposes, however, it is sufficient to note that the evidence could be viewed as indicating that any loss SBA would have incurred if TF/ATC halted its deliveries of fuel to DFSC was due largely to the agency's own failure to act responsibly and in accordance with governing regulations. If this is borne out in further proceedings, TF/ATC may be entitled, under our reasoning in Trans-Bay, to an equitable lien against the DFSC payments under the 1981 contract, which were appropriated by SBA.
 
 III. CONCLUSION
 
 63
 After reviewing the evidence and the legal arguments of appellants, we conclude that the district court erred in granting summary judgment in favor of SBA. The evidence, read in a light most favorable to appellants, could reasonably be viewed as entitling both Koch and TF/ATC to equitable relief on the ground that SBA has been unjustly enriched by their delivery of fuel oil to DFSC. We affirm the district court, however, insofar as it rejected appellants' theory of equitable estoppel against SBA. Accordingly, the order of the district court is
 
 
 64
 Affirmed in part, reversed in part, and the case is remanded for further proceedings not inconsistent with this opinion.
 
 
 
 *
 Of the United States Court of Appeals for the Sixth Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 291(a)
 
 
 [1]
 We note that Koch, while adhering to its claim of unjust enrichment, inexplicably disclaims any reliance on an equitable lien theory. Because an equitable lien is merely one form of remedy for unjust enrichment, however, we do not consider Koch's confusion to be fatal to its claim for equitable relief
 
 
 [2]
 Moreover, Congress has specifically waived SBA's sovereign immunity. 15 U.S.C. Sec. 634(b)(1) (1982) (SBA may "sue and be sued"). Assuming, however, that an agency acting in a "sovereign" capacity is less exposed to equitable claims than an agency acting in a "proprietary" capacity, but see Merrill, 332 U.S. at 383-84, 68 S.Ct. at 2-3 ("Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it"), it is extremely difficult to apply the distinction to the facts of this case. In making an advance payment loan to Tri-Par, SBA may have acted in a "sovereign" capacity, because the loan furthered the statutory purpose of section 8(a), viz. assisting socially or economically disadvantaged small businesses in obtaining and performing government supply contracts. At the same time, neither Koch nor TF/ATC argues that SBA's advance payment caused their losses. The agency action about which appellants' complain is SBA's efforts to liquidate Tri-Par's debt
 While the making of the loan and the efforts to liquidate Tri-Par's debt are obviously related, it is less clear that the agency's actions in liquidating the debt were undertaken, or will tend, to promote the purpose of the section 8(a) program. If anything, SBA's actions in this case are likely to make subcontractors reluctant to deal with section 8(a) firms for fear that, like Koch and TF/ATC, they will not be paid for the goods and services they provide to the government's chosen contractor. It seems instead that the agency acted in its proprietary capacity to recoup losses it faced because of the laxity with which it performed its sovereign role, which laxity had created risks to which the appellants would not otherwise have been exposed.
 
 
 [3]
 These allegations are supported by record evidence. Indeed, SBA's brief is not responsive to the charge that it failed closely to monitor the special Tri-Par account; it is notably silent concerning the efforts it undertook to reduce its risk of loss in connection with its advance payment to Tri-Par. In addition, the record contains a memorandum from an Assistant Inspector General, who reported within SBA that:
 Our review of the information submitted raises serious questions about the handling of this advance by the [SBA's] New York office. Although monthly bank statements were required and received, substantial credits to [Tri-Par's] regular business account were not questioned until it was too late. If the procuring activities [sic] did not make their payments jointly to SBA, as required by [the] Modification [to the 1980 contract], this should have become apparent to the person monitoring the advance account long before the contract was completed.
 
 
 [4]
 There is, of course, the ultimate factual question whether there is a causal linkage between SBA's actions and Koch's alleged losses. On the record before us, we cannot say whether proper SBA scrutiny of the special bank account would have averted these losses
 
 
 [5]
 We note that the statute was enacted after the events giving rise to this case, but appellants raise no challenge to its application here
 
 
 [6]
 TF/ATC does not question whether an agency's statutory power to effect an offset prevails over the claims of competing creditors in the ordinary course of government business. See, e.g., Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947)